I'm Robert Job and I'm appearing today on behalf of the petitioner Lidek Ghaffari who is also known as Ismael Seving. In finding that Ms. Ghaffari had failed to establish prima facie eligibility for asylum that would justify the reopening of her exclusion proceedings, board member Hess, who was the only member of the board to actually consider the motion to reopen, made three statements. I wouldn't say they are necessarily reasons, but he did make three statements. I want to look at those three statements in turn. Although board member Hess recognized that there's a lot of violence, including sexual violence, in Afghanistan against women, he found or suggested that those acts of violence were random and thus do not constitute persecution. On that point, board member Hess is simply ignoring the uncontradicted evidence of record. The principal document at issue here is a human rights report that was submitted as a supplement to the petitioner's motion to reopen. On page 16 of that human rights watch report, human rights watch reports that women continue to be assaulted or abused for not adhering to former Taliban edicts that strictly controlled women's behavior, dress, expression, and movement. It goes on to say on page 20 that as a result, women feel compelled to abide by the Taliban edicts, strictly restricting the role of women in public life, and if they don't abide, they risk abuse and even assault. There's been so many things that have happened in Afghanistan during the period of time of this petitioner's application. There's actually an Afghanistan government in place now. Yes, but at the time of this motion, Your Honor, there was an interim administration. I mean, the period of time at which this motion, the evidence at least, stops is when that interim administration was in power. It had been installed by the coalition government, but it had no authority really outside of Kabul. It was unclear to me as to what period of time the BIA was addressing. Do you know? I really don't know. It's really hard to know, and then it's hard to know. I mean, obviously, there's been reports that even though the Afghanistan government was installed, the Taliban is reemerging. It's hard to really know exactly where her claim fits in in terms of the country conditions. The motion to reopen that was filed was filed while the Taliban still controlled Kabul and at least three-quarters of Afghan territory. The board didn't decide the motion, however, until after the Taliban had been dislodged from Kabul. And at the point that the board decided the motion, the human rights situation, the political situation generally, was still evolving. We knew that the Taliban had been forced to retreat to southwestern Afghanistan, but frankly, we didn't know. No one really could say what the longer-term outcome was going to be of the coalition invasion. But in any event, the board chose not to reopen and send this case back to the immigration judge to consider that question. Instead, board member Hess simply found that at that particular point in time, he said, Ms. Ghaffari had failed to establish prima facie eligibility. And as I say, he made three – they're not really reasons. He made three statements. The first one was that violence is random. And as the Human Rights Watch report points out, that's simply not true. The violence was not random for two reasons. First, the Human Rights Watch report makes plain that women who were refusing to comply with the Taliban religious edicts were still being targeted. Certainly, that's not random. But in addition, the report goes on to say that in the north of Afghanistan, and this is where Ms. Ghaffari was from, Pashtun women had been specifically targeted for sexual violence by Uzbeki, Tajik, and Hazari warlords. This is on pages 15 and 16 of the administrative record. Human Rights Watch goes on to say that it has gathered credible evidence of continuing politically or ethnically motivated sexual violence against women and girls and other ethnicities in Mazar-e-Sharif, which is her hometown. I mean, the evidence here is not about random attacks. It's about politically motivated or religiously motivated or ethnically driven attacks. On this point, I'd also like to- Could it be enough if there's discrimination based upon gender? Well, generally, discrimination is insufficient to rise to the level of persecution. But here, and this is his second point, because he makes the sentence that, you know, persecution is an extreme concept. It doesn't encompass every, you know, act that we find unpleasant. But here, we're not talking about just pure discrimination. We're talking about assaults against women who are failing to comply with the Taliban religious edicts, and we're talking about rampant, widespread sexual assault. Great. And certainly assaults, this Court has deemed as a general matter to constitute persecution. Anything particular to this petitioner? Anything particular to this petitioner on that basis? Yes, Your Honor. It would be the fact that she is an entirely Westernized woman. She is Islamic, but she has spent, you know, more than a decade here in the United States. She lived with a man out of wedlock. She had children out of wedlock. She dresses in a Western manner. She listens to Western music. She is a product of the United States. So, counsel, I guess what I'm trying to focus on is what enumerated grounds are you claiming? It sounds like you're not claiming gender. You're claiming social group. Actually, yes. But how do you define that social group? Two different grounds, I would say. First is religion. Clearly, her refusal to comply with the Taliban's religious edicts is a religious act, and that refusal is subject to persecution in current Afghanistan. But secondly, it is on account of social group, and frankly, I think women are a social group. I think sort of — Is there any case that's ever held that? Not in this circuit, but certainly there's language in matter of ACOSTA, which is a Board of Immigration Appeals case. It's the seminal case from the Board of Immigration Appeals defining what is a social group. And in that case, the Board says that social group can be defined by one's sex. And in this case, what we have here, we have evidence of rampant sexual violence being perpetrated only against women. There is no evidence in this record that men are being subject to sexual violence or rape. The evidence of record here suggests that this form of persecution is being directed exclusively at women on a very widespread scale. The degree of risk is not certain, but let's just assume that a woman could show that there's a one in three chance that if she's returned to Afghanistan, she'll be raped. In Board members Hess's view, well, that's simply random violence. Well, I beg to differ. It's not random if it's being directed exclusively against members of one gender. It is targeted against members of a particular social group, and that social group is women. There are subsets of that social group that perhaps are in greater danger. And she is in one of those subsets because she is a westernized woman who refuses to conform to the Taliban's view of what a woman should be and how a woman should act. That doesn't undermine the fact that she is also at risk simply by virtue of being a woman. And I know that there are some circuit court cases that suggest that women cannot be a social group, and I frankly think those cases are absolutely wrong. Those cases are inconsistent with the most of the social group. With regards to social group, yes. Those cases I think are absolutely. It would be a very large social group. It would be a large social group, Your Honor. Half the population. Yes, but the fact that it's a social group doesn't mean that all those people qualify for asylum. They still have to demonstrate that they have a risk of persecution. I mean, the fact that women are a social group, in addition to showing that you are a member of a group, you have to show that you have been targeted or that you have at least a reasonable possibility of suffering harm on account of your membership in that group. So in a case like this, for example, Ms. Ghaffari would have to establish that there's at least a 10 percent chance that by virtue of her gender, she is going to be raped. Well, in most places in the world, hopefully, that's going to be impossible to prove. But in Afghanistan, it's not. In Afghanistan, because rape is so widespread and these warlords treat women as chattel, the risk of rape to women is very high. And so in the context of this case, yes, her gender combined with the current country conditions means that she qualifies for asylum by virtue of her gender. So let me ask kind of a procedural question. She'd applied for asylum. It was denied. And she didn't take steps to appeal it to our court at that time. Right. So she's got to show changed conditions in order to reopen at this later date. So something that troubles me, I say, well, what were the conditions then? What are they now? And what are we looking at? I mean, at the time that her case was first denied by the immigration judge, Afghanistan was in a state of absolute civil war. Do we look at when it was denied or when it was filed? We look at when the immigration judge heard the case because we have to establish that the evidence that we're presenting could not have been presented or discovered for that particular hearing. And at the time the immigration judge decided this case, Afghanistan was in a state of absolute civil war. The various warlords were battling with one another. And it wasn't until at least a couple years later that the Taliban emerged. And the Taliban didn't take control, really, of Kabul until 1996, four years after, I think four years after her immigration judge hearing. So clearly conditions had changed. And then they changed again because after the American-led invasion, obviously, the Taliban was forced to retreat to the southwestern part of the country. Are we returning anybody to Afghanistan right now? I really don't know the answer to that. I'll ask the government. Yeah. I don't know the answer to that. But the basic point that I want to make here is that this case must rise or fall on the reasons set forth by Board Member Hess. He gave three reasons. None of those reasons make any sense whatsoever. The last reason that he gave is to simply say that her life is not at risk. Well, she doesn't have to demonstrate that her life is at risk to qualify for asylum. She simply has to demonstrate a reasonable possibility of persecution. Persecution encompasses things like assault and rape. It doesn't only encompass dangers to one's life. And because the three reasons given by Board Member Hess simply are unsupported by the record and make no sense as a matter of logic, the Court must reverse and remand this case back to the Board. All right. Thank you, counsel. You're over your time. Thank you, Your Honor. Thank you. Please, the Court. I'm Steve Flynn, and I represent the respondent on this matter, the Attorney General. Ma'am, you hit on the central issue here. Have they shown change country conditions such that they qualify for the exception under HCFR Section 3.2C3? Let me ask. Yes, ma'am. Currently, what's the government doing? Is anybody being sent back to Afghanistan, or is there a hold on it? I can't say. As far as I know, yes, ma'am, they are still sending people back to Afghanistan. And I submit that, yes, country conditions have changed. And at the time the Board decided this case in September 2002, that change was for the better. Conditions right now in Afghanistan are the best that they've been in the last 30 years for women. At the time that this was filed in 1993, Afghanistan was comprised of factionalized fundamentalist sects, or what not, with a communist-backed government in Kabul. Did they have any control in the outlying countryside? No. Then the Taliban came to power and basically institutionalized these fundamentalist policies throughout the country. With the overthrow of the Taliban, pursuant to Operation Enduring Freedom, at this point now, for the first time in 30 years, Afghanistan has a centralized government. And that centralized government, with the backing of the United States and the United Nations and coalition forces, is doing its utmost to improve the state of women within Afghan society. At this point, never before has the Afghan government proclaimed that it's determined to equalize the status of men and women in society. That's never happened before. Have these changes rippled out throughout the entire countryside? Absolutely not. But is it ongoing? Yes. So has there been a change in country conditions such that they qualify for the CFR, 8 CFR 3.2 exception? Absolutely not, because the change in country conditions at the time the Board decided was for the better. Let me ask this. Do we look at the conditions that pertained at the time that it was filed? Do we look at them at the time that it's decided? And if they've changed yet again, do we send it back for the BIA to take another look? Well, in previous cases, this court, usually to the detriment of the government, has found taking judicial notice of change in country conditions, particularly in Fiji. There is a number of cases in that. But this evidence, as far as the change in country conditions, was before the Board. At the time the petitioner filed their second motion to reopen in November 2000, they were citing to the Taliban and saying these fundamentalist policies precluded or caused the petitioner to have a fear of future persecution. However, they then filed a supplemental brief in June 2002, wherein the petitioner acknowledged that the Taliban had been overthrown by the U.S.-led alliance. So there is evidence in the record that the Board was able to consider that country conditions had improved. And I submit that they've improved even more with the passage of time and the solidification of the Afghan regime. I've been reading, and I don't know if we can, under our case, take judicial notice of this or not, but there have been a lot of news reports lately that, in fact, the new Afghanistan government and the coalition forces are unable to control the Taliban and that it's re-emerging in Afghanistan and that perhaps, I've just been reading these reports and that the government, our government, may be a little stretched and things aren't exactly where we hoped they'd be in Afghanistan at this point in time. And what concerns me in this case is the conditions seem to keep changing. And if that's the standard under the Immigration Act, then shouldn't she at least have the opportunity to show how they've changed? She did have the opportunity. That evidence was before the Board. It was a 2002 decision. That was September 2002. Now it's December of 2003. And, ma'am, in fact, I submit that the condition, it's still in flux, and it's by no means as stable as we'd like it. But the commitment of the United States forces and the United Nations, like right now, yes, there has been an arisal of the Taliban, and we're talking in outlying areas, the attacks. Kabul has become quite stable. The market has returned there. In fact, I don't know if, you know, there was a Miss Afghanistan that participated in a beauty pageant in Singapore, whereas in the past that would have resulted in Fatwa calling for her decapitation. I mean, these days it caused a sensation in Afghanistan, but there wasn't the official condemnation. So, yes, it still is in flux, but, you know, I have friends that are right now serving with the military over there, and our commitment there is long term. In fact, in the paper today, NATO refused to send more troops to Iraq because the NATO priority is Afghanistan. There's 5,500 troops there from NATO in addition to the U.S. forces. And so far, has the condition improved to the degree we'd like in Afghanistan? Absolutely not. Is it better than it was in 1993 for a petitioner where she alleged that she would be executed by the mujahideen? Absolutely. Is it better than it was in November 2000 when she said that when the Taliban ruled the country and she would be subject to all these various atrocities that were being committed against women? Absolutely. So in that context, relative to this petitioner, she can't show those changed country conditions. They have changed, but they've improved. And once again, conditions aren't what we'd like to see here in the United States, aren't at all comparable to the United States. But relative to Afghanistan, which has been an isolated, independent state throughout history, I mean, the British were never able to conquer it. Right now, we've achieved more centralization and more cohesion in that country than has ever been achieved. I mean, the country did not even have a central government for the past 30 years. So are we where we want to be? No. But are we making improving steps? Absolutely. And just as a final point, addressing the slippery slope that the petitioner is currently arguing here, according to the position he's taken, all women from Afghanistan, by the standard he set, would qualify for asylum. Furthermore, what if they have a particular opinion that the Taliban idea of how women should be treated is rejected? That is, her opinion is that women should be treated as Westerners treat them. Would that be because of political opinion? Well, if the Taliban was still in control, that would be obviously be a consideration. We've got to keep in mind. I mean, they're they're no longer in isolated pockets. And, yeah, they become more proactive. We haven't stamped them out, but they still don't know. I was just addressing your criticism of women being a group. And I'm postulating that if you have a particular woman who is contesting the opinion of, say, the Taliban as to how women should be treated, that would be because a political opinion would not. Well, sir, it all depends on. I mean, once again, that's a slippery slope because there's different grades of like all religions. There's different degrees of how you practice that religion. So, I mean, as far as, you know, within Turkey, that's an Islamic country. However, they're fairly lax as far as wearing of the burqas and whatnot. Although you do see a number of women that do wear burqas. So if we're going to talk about how Westernized are they? Are we going to is the court going to have to engage in an analysis as to whether or not they're listening to Western music? What their sense of style and fashion is, is wearing just a thin veil enough? Do they have to have on the full burqa? It's a slippery slope. So, you know, other than her other than saying I'm Westernized and I think women should have, you know, every opportunity to advance. That's a fairly broad category, I'd say. Or should that be beaten because they don't have the burqa on? Absolutely. And importantly, for this case, we are taking steps to the United States, the United Nations coalition is taking steps to improve that situation and it has improved. That's all I have on what we're talking about. Thank you very much, counsel. The case of Seving versus Ashcroft will be submitted. We will take up United States versus Fed. The codefendant's case of Green has previously been submitted on the brief. So we will hear argument on head only with 10 minutes each side. I'm sorry, we're hearing green head was submitted. I got that exactly backwards.
judges: B. Fletcher, Hug, Wardlaw